UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| RANDY FISHER, | ) | Civil Action No.: 4:11-cv-1726-RBH-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| CITY OF NORTH MYRTLE BEACH, | ) | |
| WILLIAM BAILEY, JOHN SMITHSON | ) | |
| and STEVE THOMAS; | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## I.    INTRODUCTION

This action arises out of the termination of Plaintiff's employment with Defendant City of

North Myrtle Beach (the City).  Plaintiff's remaining cause of action alleges retaliation in violation

of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000(e) et seq.[1]  Presently before

the Court are Defendant William Bailey's (Bailey) Motion to Remand (Document # 51) his

counterclaim against Plaintiff, Plaintiff's Motion for Judgment on the Pleadings (Document # 56)

as to Bailey's counterclaim, and the City's Motion for Summary Judgment (Document # 67).[2]  All

pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28

_____

[1]The Court previously dismissed Plaintiff's state law claim for wrongful discharge in
violation of public policy and his § 1983 claim for wrongful discharge in violation of his First
Amendment Rights.

[2]It does not appear that Plaintiff has alleged his Title VII claim against the individual
Defendants, William Bailey, John Smithson or Steve Thomas.  Thus, as there are no claims
pending against these Defendants, dismissal of these Defendants is appropriate.  However,
Defendant Bailey remains a party to this action as a result of his pending counterclaim.  To the
extent Plaintiff has asserted his Title VII retaliation claim against these Defendants, dismissal is
still appropriate because Title VII does not provide for individual liability.  Lissau v. Southern
Food Service, Inc., 159 F.3d 177, 178–181 (4th Cir.1988).

U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(g), DSC.  Because this is a dispositive

motion, this Report and Recommendation is entered for review by the district judge.

## II.    MOTION FOR SUMMARY JUDGMENT

### A.    Facts

Plaintiff is a former public safety officer for the City, having first started working there in

1997. Plaintiff Dep. pp. 7-8 (attached as an Ex. to Defendant's Motion).  When the Plaintiff applied

for employment the Plaintiff held two associate degrees–one in Industrial Technology and one in

Criminal Justice.  Plaintiff's Job Application (attached as Ex. 1 to Plaintiff's Response). After

employment Plaintiff obtained a Bachelor's in Environmental Management.  Plaintiff Dep. p. 7.

During his employment, Plaintiff received meets or exceeds expectations in all categories of his

evaluations for 2009, 2008, 2007 and 2006, and received substantially exceeds in many categories

in 2005.  Plaintiff's Evaluations (attached as Ex. 5 to Plaintiff's Response).  On June 15, 2009 the

Plaintiff received his last evaluation with the Public Safety Department with the City of North Myrtle

Beach. The Plaintiff received a 3.26 on his evaluation.  Id.

When Plaintiff was first hired, Johnny Causey, Sr., served as public safety director. Plaintiff

Dep. p. 9.  Causey was succeeded by David King, who was replaced in 2006 by Bailey.  Id. pp.

10-11.  Plaintiff describes as "fair" his relationship with Bailey prior to Bailey's appointment as

public safety director.  Id. p. 11.  Plaintiff describes that relationship as "strained" once Bailey was

appointed as public safety director.  Id.  He testified, "I just don't think Mr. Bailey ever respected

me." Id.  Plaintiff worked in the community services division until Bailey became the Director. Once

Bailey became the Director, Plaintiff was removed from his position. Mr. Bailey stated the position

was a sergeant position. The Plaintiff offered to accept a demotion in order to stay in the position

because he was best utilized in that position.  Ex. 6 to Plaintiff's Response.

In April 2009, a wildfire struck the City.  Id. pp. 12-13.  The fire "went of out control quickly" and damaged approximately 70 homes in a neighborhood known as Barefoot Resort.  Id. pp. 13-14, 17.  The fire received extensive local and national media coverage, and many residents were critical of the City's response to the fire.  Id. pp. 16-17.  Mike Ragusa (Ragusa) is a Barefoot homeowner and a friend of Plaintiff's.  Id. pp. 12, 15.  Plaintiff and Ragusa talked "a bunch" about the wildfire and eventually Ragusa "got on a tangent where he wanted to find out what actually happened and he started asking for videos from the city and he would call [Plaintiff] when he would find stuff he would say I found this out, I found that out."  Id. p. 16.  Officials within the City came to believe that Plaintiff was relaying information to Ragusa to tell him where to look to continue his review of the wildfire.  Id. p. 18.  Plaintiff denies that he gave Ragusa any such information.  Id.

In June 2009, Plaintiff met with Assistant City Manager Steve Thomas to complain that Bailey was repeatedly referencing Plaintiff and Ragusa's friendship when Bailey talked about Ragusa "stirring everything up in Barefoot."  Id. pp. 20- 22.  Plaintiff recorded this meeting with Thomas, as well as many other conversations he had with City employees.  Id. p. 19.  During the course of that conversation, Plaintiff also complained that City victim advocate Krista Cooper, a female, received "special treatment . . . [b]ecause of her relationship with the director," Bailey.  Id. p. 24.  Asked to clarify what he meant, Plaintiff testified that "pretty much everyone discussed . . . in the department" their suspicion that Cooper and Bailey were involved in a romantic relationship.  Id.

Plaintiff also complained that one of his female subordinates, Carol Johnson[3], was disciplined

---

[3]Johnson filed a complaint of discrimination in August of 2009, which Defendant removed to this Court on September 28, 2009.  See Johnson v. City of North Myrtle Beach, 4:09-cv-2530-TLW-TER.

more harshly than Brett Holland, a male employee.  Id. pp. 25-26. During his deposition, when asked

if he was making a complaint of gender discrimination, Plaintiff testified:

> Q. Did you look at the difference in treatment between Ms. Johnson and Mr. Holland
> as a difference because of their genders?
> A. No.
> Q. Did you look at it as just being unfair?
> A. Yes.
> Q. Is that the same way you viewed the Krista Cooper issue there, that the treatment
> she got was simply unfair or favoritism?
> A. Favoritism.

Id. p. 27.

Plaintiff also brought up an issue regarding "people that, you know, fix time cards and

nothing ever happened to them."  Id.  He was referring to two officers, one male and one female.

Id.  Plaintiff testified that complaint was also about favoritism and had nothing to do with any

perceived gender discrimination.  Id. p. 28.  He also complained that a male lieutenant showed up

at work out of uniform, stating, "If I came in without a duty uniform, I'd be sent home."  Id. p. 30.

He perceived that incident as another example of unfair treatment within the public safety

department, this time between two males.  Id. p. 31.  Finally, Plaintiff complained about lieutenants

like himself being excluded from receiving pay from a one percent tax used to pay firefighters, while

dispatchers were included.  Id. pp. 32-33.  Plaintiff testified that all of the lieutenants in the City's

public safety department were male, while dispatchers were divided fairly evenly gender-wise.  Id.

p. 33.

Plaintiff met again with Thomas on August 8, 2009.  Id. p. 46.  He inquired about the one

percent tax money issue, and reiterated his concerns about unfair treatment in the department.  Id.

Asked to sum up his complaints, Plaintiff testified:

Q. Did you ever report to the major or to Mr. Thomas anything related to unfair

treatment of women in the department or unfair treatment of men in the department
or unfair treatment of blacks, whites or anything along those lines?
A. The only thing I would say is Krista Cooper got special treatment.

Id. p. 47.

In November 2009, Bailey presented a memorandum to City manager John Smithson
(Smithson) dated November 10, 2009. Id. p. 49; Memorandum (attached as Ex. A to Defendant's
Motion). Bailey represented to Smithson that he had reviewed logs showing who had watched
certain public safety department in-car videos of the City's response to the wildfires, as well as cell
phone records which showed numerous calls between Plaintiff and Ragusa. Id. In all, between April
23, 2009, and August 18, 2009, Plaintiff and Ragusa spoke on Fisher's City-issued cell phone 160
times in 117 days for a total of approximately 15 hours of conversations. Plaintiff does not dispute
those numbers. Plaintiff Dep. p. 50. Bailey reported to Smithson that he "found there was a pattern
of Lt. Fisher's reviews that indicated he had reviewed tapes just before the media had released stories
related to the videos viewed." Memorandum. Bailey concluded that "Lt. Fisher's actions deeply
concern me and I request your review into this situation for your recommendations." Id. Plaintiff
disputes this finding by Bailey and asserts that the videos he reviewed that were related to the fires
were viewed after the media had released stories and after talking to Ragusa. Video Log (attached
as Ex. 13 to Plaintiff's Response).[4]

Following Bailey's November 10, 2009, memorandum, Plaintiff met with Thomas. Plaintiff
Dep. p. 53. Plaintiff recorded this conversation as well. Conversations from Flash Drive # 13
(attached as Ex. 6 to Plaintiff Dep.). Thomas asked Plaintiff to explain the data that Bailey had

_____

[4]The Video Log indicates the dates and times on which particular videos were viewed and
by whom. Nothing in the record indicates when particular stories were released by the media.

presented regarding the wildfire videos Plaintiff had viewed and the numerous cell phone calls Plaintiff made to Ragusa. Plaintiff Dep. p. 54.  Plaintiff responded that due to Ragusa's role as a vocal critic of the City's response to the wildfire, he felt it would be better not to be seen in public with Ragusa.  Id. p. 60.  Instead, he called him 160 times over 117 days.  Id.  Upon hearing Fisher's explanation, Thomas was skeptical.  Id.

> Q. . . .So he's telling you that he thinks you were giving that information to Mr. Ragusa and he asked you that based on the information that he has whether or not you would believe the explanation that you provided and you tell him you don't know whether or not you would believe the explanation you provided, is that correct?
> A. Yes.
> Q. So you understood how he would be suspicious of the data that had been presented to him and your explanation of that data?
> A. Yes.

Id. p. 60.  Ultimately, Plaintiff told Thomas, "[A]ll I can say is I can't give you an explanation." Id. p. 63.  Plaintiff testified that "I still feel I probably shouldn't have talked to [Ragusa] as often as I did" and that he understood how those frequent communications contributed to the perception that he was giving Ragusa information.  Id. p. 68.

Plaintiff and Thomas also discussed Fisher's complaints of favoritism. When told by Thomas that he viewed Plaintiff as unhappy with much of what occurred in the City's public safety department, Plaintiff replied:

> No, that's not true. I'm just asking him to do right. I am not saying anything he can do is right, I'm asking him to do right and that's what this whole issue's about, and I told you that from the beginning. The only issue I have is Krista Cooper's free reign of getting to do what she wants over there and I'd like somebody to do the right thing about it and deal with it.

Id. p. 56-57 and Ex. 6 p. 4. When he told Thomas that "my employees are held that work under me are held to a different standard" than Cooper, he was referring to both his male and female subordinates.  Id. p. 57.

-6-

At the conclusion of their last meeting, Thomas advised Plaintiff that he needed to resign or he would be terminated.  Id. p. 53.  Plaintiff chose to resign.  Resignation Letter (attached as Ex. 7 to Plaintiff Dep.).  Thereafter, he filed a grievance as to his forced resignation, in which he wrote, "I feel this is all in retaliation for my attempts to address unfair and unbalanced treatment of employees by command staff (Major Floyd, Director Bailey)."  Grievance Memorandum (attached as Ex. 8 to Plaintiff Dep.).  That statement was in reference to both female and male employees being shown favoritism.  Plaintiff Dep. p. 65.

Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) on March 10, 2010, alleging retaliation.  Plaintiff alleged in his EEOC Charge that his employer retaliated against him for complaining of disparate treatment of female and male police officers.  Plaintiff received a Right to Sue Letter on March 14, 2011.  Plaintiff filed the present action in state court on June 13, 2011.  Defendants removed the case to this court on July 18, 2011.

### B.    Standard of Review

The moving party bears the burden of showing that summary judgment is proper.  Summary judgment is proper if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof.  Celotex, 477 U.S. 317.  Once the moving party has brought into question whether there is a genuine dispute for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine dispute for trial.  Fed.R.Civ.P. 56(e); Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986).  The non-moving party

must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Barber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

To show that a genuine dispute of material fact exists, a party may not rest upon the mere allegations or denials of his pleadings. See Celotex, 477 U.S. at 324. Rather, the party must present evidence supporting his or her position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed.R.Civ.P. 56(c)(1)(A); see also Cray Communications, Inc. v. Novatel Computer Systems, Inc., 33 F.3d 390 (4th Cir. 1994); Orsi v. Kickwood, 999 F.2d 86 (4th Cir. 1993); Local Rules 7.04, 7.05, D.S.C.

### C.     Discussion

Plaintiff alleges that the City retaliated against him for voicing his opposition to disparate treatment between male and female police officers within the department. Title VII makes it an "unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation,

proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

The familiar proof scheme developed in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) applies to claims under Title VII. To establish a prima facie case of retaliation under Title VII, a plaintiff must show (1) he engaged in protected activity, (2) the employer took adverse employment action against him, and (3) a causal connection existed between the protected activity and the adverse action. Ross v. Communications Satellite Corp., 759 F.2d 355, 365 (4th Cir.1985); Laughlin v. Metropolitan Washington Airports Authority, 149 F.3d 253, 258 (4th Cir.1998); Causey v. Balog, 162 F.3d 795, 803 (4th Cir.1998). If Plaintiff establishes a prima facie case, Defendant can rebut the presumption of retaliation by articulating a non-retaliatory reason for its actions. At that point, Plaintiff has the opportunity to prove that Defendant's legitimate, non-retaliatory reason is pretextual. See Matvia v. Bald Head Island Management, 259 F.3d 261, 271 (4th Cir.2001).

Defendant argues that Plaintiff's retaliation claim fails because he engaged in no protected activity and, even if he did, he cannot show a causal connection between that activity and his adverse employment action.[5] "Protected activities fall into two distinct categories: participation or opposition .... An employer may not retaliate against an employee [for] participating in an ongoing investigation or proceeding ... nor may the employer take adverse employment action against an employee for opposing discriminatory practices in the workplace." Laughlin v. Metropolitan Washington Airports Auth., 149 F.3d 253, 259 (4th Cir.1998). "[T]he 'opposition clause,' by its very terms, requires that the employee at least have actually opposed employment practices made

---

[5]Defendant concedes that its ultimatum that Plaintiff either resign or be terminated amounts to an adverse employment action.

unlawful by Title VII. That is to say, the clause protects opposition neither to all unlawful employment practices nor to practices the employee simply thinks are somehow unfair." McNair v. Computer Data Sys., Inc., 172 F.3d 863, 1999 WL 30959, at *5 (4th Cir.Jan.26, 1999) (unpublished). Thus, to constitute protected activity, Plaintiff's opposition must have been based on a class protected by Title VII–"race, color, religion, sex, or national origin."  42 U.S.C. § 2000e–2(a)(1). Additionally, to constitute "protected activity," a plaintiff must reasonably believe that the employment practice is unlawful. Jordan v. Alternative Resources Corp., 458 F.3d 332, 338 (4th Cir.2006).

Plaintiff argues that he engaged in protected activity on several occasions.  Plaintiff argues that he engaged in protected activity when he met with Assistant City Manager Steve Thomas in June of 2009.  During that meeting, Plaintiff complained that 1) Bailey repeatedly referenced Plaintiff's friendship with Ragusa in the context of Ragusa "stirring everything up in Barefoot," 2) a female employee, Krista Cooper, received favorable treatment because of a perceived romantic relationship between her and Bailey, 3) a female subordinate, Carol Johnson was disciplined more harshly than a male employee, 4) officers, both male and female, fix time cards with out any repercussions, 5) a male officer appeared at work out of uniform without being sent home, and 6) lieutenants like him were excluded from receiving pay from a one percent tax used to pay firefighters while dispatchers, both male and female, did receive such pay.

Importantly, Title VII is not a "general civility code for the American workplace."  Oncale v. Sundowner Offshore Servs ., Inc., 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998).  Thus, "making general workplace complaints is not protected activity."  Albero v. City of Salisbury, 422 F.Supp.2d 549, 560 n. 43 (D.Md.2006); see also Barber v. CSX Distrib. Servs., 68 F.3d 694, 702 (3d

-10-

Cir.1995) (in an ADEA case, "a general complaint of unfair treatment does not translate into a charge of illegal age discrimination"); Tomanovich v. City of Indianapolis, 457 F.3d 656, 663 (7th Cir.2006) ("Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient .") (citing Gleason v. Mesirow Fin., Inc., 118 F.3d 1134, 1147 (7th Cir.1997); Miller v. Am. Fam. Mut. Ins., 203 F.3d 997, 1008 (7th Cir.2000) (holding that Plaintiff did not engage in a protected activity where "[h]er complaints instead concerned a general displeasure with being paid less than her co-workers given her longer tenure and the fact that she had trained some of them" and not discrimination based on a protected class); Albero, 422 F.Supp.2d at 560 n. 43 (holding complaints of favoritism are not sufficient to amount to protected activity).

Accordingly, of the complaints raised by Plaintiff during the June 2009, meeting, only the complaint regarding Johnson arguably amounts to protected activity.  However, during his deposition, Plaintiff testified that he did not view the differential treatment between Johnson and Holland as a matter of gender; rather, it was unfair.  Plaintiff Dep. p. 27.  Unfair treatment, irrespective of gender, does not rise to the level of an unlawful employment action.  See Barber, 68 F.3d at 702 (finding, in and ADEA case, that "a general complaint of unfair treatment does not translate into a charge of illegal age discrimination").  A review of the transcript from Plaintiff's recording of his June 2009 meeting with Thomas reveals the nature of Plaintiff's complaint regarding Johnson.[6]  Conversations from Flash Drive # 9 (attached as Ex. 10 to Plaintiff's Response).  After

---

[6]In the transcript, "Male 1" refers to Plaintiff and "Male 2" refers to Thomas.  Plaintiff Dep. p. 22.

discussing various problems within the department[7], none of which were gender related, Plaintiff

states,

> Male 1:  [A]nother prime example is, you know, one of my officer[s] makes a
> judgment mistake.  She kept her, she put her daughter in the female bunk room and
> she gets fired.  Three months later, an officer get[s] caught stealing freaking gas,
> committing a larceny in uniform, in his patrol care and he's given the option to, to
> resign.  Now, how does that work?
> Male 2:  Yeah, I was, who was the one that was the female?
>
> Male 1:  Carol Pound[8], the director didn't like her.  She had a loud mouth.
> Male 2:  And what, that must have happened right before, I got here in January, that
> must have happened not long before I came?
> Male 1: It happened before you got here.  And, and the thing was is the director and
> Walt couldn't stand her and so now she, and I was shocked because I wrote her up
> and they said well don't put the punishment down and when I came back they said
> she's gonna be fired and I said well you've got to be kidding me?  But, yet this kid
> does something he should have been put in jail for and he's allowed to resign.

Conversations from Flash Drive # 9 p. 9.  Plaintiff then goes on to complain of the officers who were

allowed to fix time cards without repercussions, and discusses Bailey's repeated reference to the

connection between Plaintiff and Ragusa, the one percent tax money and the wildfires.

The totality of the concerns raised by Plaintiff during the June 2009 meeting does not reveal

a concern by Plaintiff that the City was engaged in unlawful employment practices.  In addition,

when Plaintiff raises the issue regarding Johnson,  he does not make any indication that he felt the

disparity in treatment was gender related nor does he even specifically point to the gender of either

---

[7]These issues included Bailey's repeated referral to Ragusa as Plaintiff's friend, the
preferential treatment received by Cooper, trouble Plaintiff had with Bailey prior to him
becoming Director, Bailey giving Plaintiff's subordinates instructions as to what Plaintiff needed
to do, and the failure by Bailey and others in the City to address other issues raised by Plaintiff.
See generally Conversations from Flash Drive # 9 pp. 1-9.

[8]Plaintiff indicates in his deposition that this conversation regarded Carol Johnson.
Plaintiff Dep. p. 25.

of the officers.  Furthermore, as an apparent explanation for why Johnson was fired, Plaintiff states the director "didn't like her" and the director and Walt "couldn't stand her."  Id.  Finally, in his deposition, Plaintiff testifies that he did not believe the disparate treatment between Johnson and Holland was a result of their genders.  Plaintiff Dep. p. 27.  As stated above,  "a general complaint of unfair treatment does not translate into a charge of illegal ... discrimination."  Barber, 68 F.3d at 702.  Thus, Plaintiff fails to present sufficient evidence to show that his complaints to Thomas during the June 2009 meeting amounted to protected activity.

Plaintiff met with Thomas again on August 8, 2009, to discuss the one percent tax money and the issues discussed in the June 2009 meeting.  Plaintiff Dep. p. 46.  When asked in his deposition whether he raised any issues during the August 8, 2009, meeting regarding gender or race discrimination, Plaintiff replied, "[t]he only thing I would say is Krista Cooper got special treatment."  Id. p. 47.  Thus, for the same reasons discussed above with respect to the June 2009 meeting, nothing addressed by Plaintiff in the August 8, 2009, meeting amounts to opposition unlawful employment conduct.

Plaintiff also argues that he engaged in protected activity through his participation in Johnson's claim with the EEOC and subsequent civil action that was filed in state court in August of 2009.[9]  Plaintiff was listed as a witness in Johnson's civil action and counsel for the City subpoenaed his records.  Activities that constitute participation include "(1) making a charge; (2) testifying; (3) assisting; or (4) participating in any manner in an investigation, proceeding, or hearing under Title VII."  Laughlin, 149 F.3d at 259 (citing 42 U.S.C. § 2000e–3(a)).  Thus, Plaintiff

---

[9]Plaintiff indicates that he "appeared in support of Ms. Johnson in a TV interview." Response p. 10.  However, he provides no citation to the record regarding this TV interview or when it occurred.

engaged in protected activity by participating in Johnson's lawsuit.  See, e.g., Brockman v. Snow, 217 Fed. Appx. 201, 206 (4th Cir.2007) (holding that acting as a witness in a Title VII claim is protected activity).

However, even though Plaintiff participated in Johnson's Title VII action, he fails to show a causal connection between this protected activity and his forced resignation.  Plaintiff fails to present evidence that the City knew of his participation in Johnson's action prior to his forced resignation.  An employer's knowledge that the employee engaged in protected activity is "absolutely necessary to establish the third element of a prima facie case." Dowe v. Total Action Against Poverty, 145 F.3d 653, 657 (4th Cir.1998); see also Baqir v. Principi, 434 F.3d 733, 748 (4th Cir.2006); Hooven–Lewis v. Caldera, 249 F.3d 259, 273 (4th Cir.2001).  Plaintiff points to the fact that Johnson's civil action was filed in August of 2009, prior to his resignation in November of 2009. However, Plaintiff fails to present sufficient evidence to show that the City was aware at the inception of the lawsuit of his participation.[10]   The City argues that it first became aware of Plaintiff's involvement in Johnson's action when Johnson filed her Rule 26.03 Responses on January 11, 2010, in which she listed Plaintiff as a witness.  Johnson Rule 26.03 Responses (attached as Ex. B to Defendant's Reply).  Because the record evidence reveals that the City became aware of Plaintiff's participation in Johnson's Title VII action only after he resigned in November of 2009, Plaintiff fails to show that a causal connection exists between his protected activity and the adverse employment action.

Plaintiff also appears to argue that, because Johnson filed a lawsuit alleging gender

---

[10]Plaintiff also asserts that he participated in Johnson's EEOC claim.  However, he fails to present evidence to support this assertion.

-14-

discrimination in August of 2009, the City was on notice at least by that time that Plaintiff's earlier complaint about Johnson's treatment was based upon her gender.  This argument is without merit. As discussed above, Plaintiff's concerns regarding Johnson's termination came amidst many other, non-gender related complaints raised by Plaintiff during the June 2009 meeting and without any emphasis placed on the gender of Johnson or the other officer whom Plaintiff felt was treated more favorably.  Furthermore, Plaintiff testified that his concern was not based upon Johnson's gender. That Johnson subsequently filed a Title VII action alleging gender discrimination does not suddenly convert Plaintiff's general complaint of unfairness to one of opposition to gender discrimination.

In sum, Plaintiff fails to show that he engaged in protected activity when he met with Thomas in June and August of 2009 to address complaints he had regarding the way things were being handled by the City.  Additionally, even though Plaintiff did engage in protected activity by participating in Johnson's Title VII lawsuit, he fails to show a causal connection between this participation and his forced resignation because the record reveals that the City became aware of his participation only after Plaintiff resigned.  Therefore, Plaintiff fails to establish a prima facie case of retaliation and summary judgment is appropriate.

Nevertheless, assuming arguendo, Plaintiff has established a prima facie case of retaliation, Defendant has produced a legitimate, non-retaliatory reason for forcing Plaintiff to resign.  The City's proffered reason for requiring Plaintiff to resign is because it believed he was providing information to Ragusa regarding the wildfires.  Thus, the burden shifts back to Plaintiff to present sufficient evidence to show that Defendant's reason for the adverse employment action was not its true reason but pretext for a retaliatory reason.

Plaintiff adamantly denies providing information to Ragusa regarding the wildfires and cites

to evidence to support of this argument.  However, Plaintiff does not dispute that Thomas genuinely believed Plaintiff was engaged in that misconduct, and he acknowledges how his frequent communications with Ragusa could give Bailey and Thomas that impression.  Plaintiff Dep. pp. 60, 68.  Nevertheless, "[a] factual dispute as to whether [misconduct] actually occurred does not amount to a factual dispute as to whether City officials based their disciplinary decision . . . upon the belief that [it had]." Croft v. City of Roanoke, 862 F.Supp.2d 487, 497 (W.D.Va. 2012); see also Holland v. Washington Homes, Inc., 487 F.3d 208, 217–18 (4th Cir. 2007) (concluding that no reasonable juror could conclude that the decision maker's reason was pretextual where the plaintiff's evidence "failed to address whether [the decision maker] did not honestly believe that" plaintiff had engaged in the alleged misconduct).  Thus, regardless of whether Plaintiff actually provided information to Ragusa regarding the wildfires, it is Plaintiff's responsibility to show that Thomas did not honestly believe that he had provided the information, but forced him to resign in retaliation for opposition to employment actions made unlawful by Title VII.  Plaintiff fails to produce sufficient evidence to show that Thomas did not honestly believe Plaintiff was providing information to Ragusa.

In sum, it is Plaintiff's burden ultimately to show that illegal retaliation was the motivating factor in his forced resignation. It is not necessary for this court to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for Defendant's decision. Hawkins v. Pepsico, 203 F.3d 274, 279 (4th Cir.2000). Plaintiff must show that a reasonable jury could believe her explanation of intentional retaliation.  Love–Lane v. Martin, 355 F.3d 766, 788 (4th Cir.2004).  Plaintiff has failed to meet his burden of creating a genuine dispute of material fact as to whether his forced resignation was a result of retaliation for engaging in activity protected by

Title VII.[11] Therefore, summary judgment is appropriate.

## III.    MOTION TO REMAND

If the district judge accepts this Report and Recommendation, then the original federal

jurisdiction claim will be dismissed and the only remaining claim will be Defendant Bailey's state

law claim for defamation. Title 28 U.S.C. § 1367(c)(3) provides, in pertinent part, "[t]he district

courts may decline to exercise supplemental jurisdiction over a claim ... if ... the district court has

dismissed all claims over which it has original jurisdiction...." The Fourth Circuit has recognized that

"trial courts enjoy wide latitude in determining whether or not to retain jurisdiction over state claims

when all federal claims have been extinguished." Shanaghan v. Cahill, 58 F.3d 106, 110 (4th

Cir.1995) (holding district court did not abuse its discretion in declining to retain jurisdiction over

the state law claims). See also, e.g., United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726–27,

---

[11]In his Response, Plaintiff discusses a management review of the North Myrtle Beach Department of Public Safety conducted in April 2010 by the University of South Carolina Institute for Public Service and Policy Research at the request of the City Manager.  Management Review (attached as Ex. 8 to Plaintiff's Response).  The review made the following findings, among others:

> Of specific concern in the public safety department are the issues of race and gender discrimination. . . . Many of the female interviewees and survey respondents and several of the male employees do believe that some employment decisions were based on gender. They pointed to the absence of any female supervisors in the uniform patrol or investigations. Specifically examples personally experienced were refusals to allow light duty for female officers which medical conditions and to purchase properly fitting equipment for female officers. Other female officers describe situations in the past that have been addressed and resolved.  However, there is still a perception among many of the employees that it is not wise to raise discrimination issues because of the possible retaliation from the command staff.

Management Review pp.4-5.  While this information is troubling, it fails to lend weight to Plaintiff's prima facie argument because it fails to show a causal connection between any protected activity by Plaintiff and his resignation nor is it probative of his pretext argument because it fails to show that Thomas truly believed Plaintiff had provided information to Ragusa regarding the wildfires.

86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); <u>Revene v. Charles County Comm'rs</u>, 882 F.2d 870, 875 (4th Cir.1989). Therefore, the undersigned recommends that the district judge decline to retain jurisdiction over Defendant Bailey's state law counterclaim.  Because this action was removed from the Court of Common Pleas, Horry County, South Carolina, remand of the counterclaim is appropriate.

## IV.    CONCLUSION

For the reasons discussed above, it is recommended that Defendant City of North Myrtle Beach's Motion for Summary Judgment (Document # 67) be granted and Plaintiff's Title VII cause of action dismissed and that Defendant William Bailey's Motion to Remand (Document # 51) be granted and this case be remanded to the Court of Common Pleas, Horry County, South Carolina.[12]


 s/Thomas E. Rogers, III
Thomas E. Rogers, III
United States Magistrate Judge

May 16, 2013
Florence, South Carolina

---

[12]As a result, Plaintiff's Motion for Judgment on the Pleadings (Document # 56) as to the counterclaim would be remanded for resolution by the state court.